UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JEFFREY W.,

                              Plaintiff,

        -against-                                          1:18-CV-0115 (LEK)

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

On January 26, 2018, plaintiff Jeffrey W. filed an action in this Court under the Social

Security Act. He seeks review of the determination of the Commissioner of Social Security that

he was not disabled during the period October 17, 2014 through March 7, 2017 (the "relevant

period"). Dkt. Nos. 1 ("Complaint"), 8 ("Record") at 10, 22. Both parties have filed briefs. Dkt.

Nos. 13 ("Plaintiff's Brief"), 14 ("Defendant's Brief"). For the reasons that follow, the

Commissioner's determination of no disability is vacated, and the matter is remanded for further

proceedings.

## II.    LEGAL STANDARD

### A.  Standard of Review

When a district court reviews an Administration Law Judge ("ALJ")'s decision, it must

determine whether the ALJ applied the correct legal standards and whether his or her decision is

supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence

amounts to "more than a mere scintilla," and it must reasonably support the decision maker's

conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, a court should not uphold the ALJ's decision—even when there is substantial evidence to support it—if it is based on legal error. Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).

**B. Standard for Benefits**

According to Social Security Administration ("SSA") regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984). In order to receive disability benefits, a claimant must satisfy the requirements of a five-step evaluation process. 20 C.F.R. § 404.1520(a)(1). If the ALJ is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. Id.

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." § 404.1520(a)(4)(i). If so, the claimant is not disabled under SSA regulations. Id. At step two, the ALJ must determine whether the claimant has an impairment, or

combination of impairments, that is "severe," i.e., that "significantly limits" the claimant's "physical or mental ability to do basic work activities." §§ 404.1520(a)(4)(ii), 416.920(c). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the ALJ asks whether the claimant's medically determinable physical or mental impairment(s) are as severe as an impairment of the requisite duration listed in Appendix 1 of Subpart P of § 404. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If not, the ALJ moves on to step four and reviews the claimant's residual functioning capacity ("RFC") and past work. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if he can perform past work. Id. If the claimant cannot perform his past work, the ALJ decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. § 404.1520(a)(4)(v). If the claimant "cannot make an adjustment to other work," then the claimant is disabled under SSA standards. Id. In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

III.     BACKGROUND

A. The Disability Allegations and Evidence

Plaintiff is a sixty-six-year-old man with a high school education. R. at 75, 259. He has past work as a retail manager. Id. at 73, 204. Plaintiff is 5'10" tall and weighs 280 pounds. Id. at 259. Prior to his bariatric surgery in 2012, Plaintiff weighed 358 pounds. Id. at 505. Plaintiff initially sought a finding of disability due to hip replacements, atrial fibrillation, severe arthritis across lower back and hips, spinal stenosis, mini-stroke, sleep apnea, kidney stones removed by laser, obsessive compulsive disorder ("OCD"), anxiety disorder, and depression. Id. at 203,

3

259–60. At the appeal level in the SSA, Plaintiff also alleged degenerative joint disease of the left knee. Id. at 259.

### 1. Plaintiff's Testimony

Plaintiff had two hip replacement surgeries on his right hip before the relevant period, and testified before the ALJ in November 2016 that he still had pain in his hip, but not very often. Id. 81. Pain in his left hip got "so bad" that Plaintiff had that hip replaced in November 2014, at the beginning of the relevant period. Id. at 82. His pain then decreased and became more "bearable." Id. Still, however, Plaintiff reported feeling a "stinging pain" in his left hip a couple of times per day, for a couple of minutes each time. Id. at 82–83. He feels pain in his left hip if he "move[s] or twist[s] or if [he] sit[s] too long." Id. at 82.

Plaintiff also reported "constant" back pain and stiffness radiating into his arms, as well as neck pain, despite cortisone and steroid injections. Id. at 83–85. Plaintiff also testified to the spinal stenosis in his lower spine, which he had surgery on in January of 2015, id. at 77.

As to his left knee, Plaintiff testified that he experienced pain and popping before having surgery in February 2016, and that he still felt pain after the surgery, though "a lot less." Id. at 80–81. As to his obesity, Plaintiff reported that he has had no symptoms related to his bariatric surgery, which had resulted in considerable weight loss before the relevant period. Id. at 73, 87, 505. Plaintiff testified that he could only stand and walk for "very short" periods, but that he could carry a 20-pound bag of dog food in the house (albeit with discomfort). Id. at 89. Plaintiff also testified that he could stand and walk for an hour at a time before needing to rest for ten or fifteen minutes, that he could sit for ten minutes before needing to stand, and that he could sit for two hours in a recliner with a break. Id. at 89–90, 100. Plaintiff reported that he could repeat a

cycle of one hour of walking/standing and fifteen minutes of rest, for six hours, but that he would not be able to do it again the following day. Id. at 100. Plaintiff reported that the longer he walks or is on his feet, the more pain he experiences, and that he has to use a cane when walking "long distances." Id. at 82, 85. As to his right wrist, on which he underwent a bone graft in 1979, Plaintiff reported pain every time he moves it, which has caused him to frequently drop things. Id. at 85–86. Plaintiff testified that his right wrist pain complicated his use of the cane, since the cane, used to take pressure off the left knee, should be held in the hand opposite the faulty knee. Id. at 86–87.

Plaintiff reported that his depression and OCD prevented him from working, but that he stopped attending psychotherapy because he did not think it was helping. Id. at 87–89. He reported taking Gabapentin for his depression. Id.

Plaintiff testified that he could not do his prior retail job managing grocery stores because of the walking, bending, standing, driving, and sitting that it would entail. Id. at 90. Plaintiff testified, however, to performing housekeeping chores, doing physical therapy, walking his dogs (though just in his yard and off-leash), going shopping five or six times per month, and fishing for hours at a time. Id. at 91–94, 96, 228, 552. In doing household chores, Plaintiff said he experienced physical difficulty, but that he's "been in pain for so long" that he's "used to it." Id. at 91. Likewise, after fishing, Plaintiff reported that he was "sore" and "hurting," and that he had to "not move for a while," lying in bed "a lot," to relieve his discomfort. Id. at 96. While Plaintiff testified to being able to drive, id. at 72, he said that due to his hip surgeries he cannot drive the hundreds of miles he used to drive as a territory manager for grocery stores, id. at 74. He testified that he recently spent two hours replacing a bathroom faucet, but that he had needed a day or two

5

to recover. Id. at 99. In addition, Plaintiff testified that he is able to manage his money, bank

online, watch movies (though he would have to stand up and stretch), play poker, and use

computers. Id. at 15, 91–94, 96, 218–19.

### 2. Nurse Practitioners Izzo and Aiello

In July 2014, just prior to the relevant period, Plaintiff's treating nurse practitioner,

Antonio Izzo, noted mildly decreased range of motion in Plaintiff's bilteral upper and lower

extremities, with preserved strength, no tenderness to palpation, and no gross motor or sensory

deficits, but decreased range of motion of the lumbar spine. Id. at 303–05. Izzo noted that

Plaintiff's back pain was previously treated with injections with excellent results, and

recommended continued treatment with injections. Id. In an October 2014 examination, Nurse

practitioner Lorina Aiello echoed Izzo's findings, and diagnosed Plaintiff with lumbago and

enthesopathy in his hip region. Id. at 307–08.

### 3. Dr. O'Connor

Dr. William O'Connor, who performed Plaintiff's left hip replacement in November

2014, noted Plaintiff's post-operative diagnosis as left hip osteoarthritis. Id. at 396, 432, 500. At

discharge, Dr. O'Connor recommended that Plaintiff bear weight as tolerated with a walker. Id.

at 423, 431. In a follow-up appointment in January 2015, Dr. O'Connor reported that Plaintiff

was doing well, scoring 4+ out of 5 in terms of hip flexor, extensor, and abductor strength, and

distally and neurovascularly intact. Id. at 491. However, he also opined that Plaintiff was no

longer capable of gainful employment. Id. Later, in November 2016, Dr. O'Connor prepared a

physical capacity evaluation questionnaire for Plaintiff, checking boxes indicating that Plaintiff

can sit for eight hours, stand for one hour, and walk for zero hours, and that Plaintiff would need

6

to alternate between sitting, standing and lying. Id. at 552. Dr. O'Connor also noted that Plaintiff could continuously lift six to ten pounds, and occasionally eleven to twenty pounds, and could use hands for repetitive actions. Id. at 552–53. Dr. O'Connor concluded that Plaintiff was permanently disabled. Id.

### 4. Dr. Rogers

In February 2015, Dr. William Rogers examined Plaintiff and diagnosed him with status post lumbar disc surgery, status post bilateral total hip replacements, degenerative joint disease of left knee, chronic atrial fibrillation, a history of renal stones, depression, obesity, gastroesophadeal reflux, and environmental allergies. Id. at 506. Dr. Rogers noted Plaintiff's main physical restrictions related to his low back, left hip and left knee; he further noted that Plaintiff could not perform "prolonged" periods of standing or walking or moderate to heavy lifting, but that his back pain is better when he is "on his feet." Id. at 504–06. Dr. Rogers also noted that Plaintiff could sit for a couple of hours if not in a hard chair. Id.

### 5. Dr. Ortiz

Plaintiff's urologist, Dr. G. Michael Ortiz, noted in December 15, 2014, that Plaintiff had no limitations on lifting, standing, walking, sitting, and pushing or pulling, and no postural limitations. Id. at 445, 448.

### 6. Dr. Astruc

Dr. Astruc, a psychiatrist, treated Plaintiff twelve times between May 2015 and October 2016. Id. at 27–64. In assessments throughout 2015 and 2016, Dr. Astruc noted that Plaintiff's insight, judgment, memory, and concentration were "intact," and that his thought process was "goal oriented." Id. at 29, 32, 35, 38, 41, 44, 47, 50, 53, 56, 59, 64, 547. Dr. Astruc also

repeatedly noted Plaintiff's appropriate grooming and hygiene, cooperative manner, and good eye contact, while also noting that Plaintiff was sad/depressed. Id. On January 31, 2017, Dr. Astruc prepared a Psychiatric Review Technique Report. Id. at 554–556. In that 2017 Report, Dr. Astruc noted that Plaintiff had "marked" limitations in social functioning, and in "concentration, persistence, or pace;" and "mild" limitations on activities of daily life. Id. at 556. Dr. Astruc also noted that Plaintiff had "marked" episodes of decompensation of extended duration.[1] Id. On the basis of these findings, Dr. Astruc concluded that Plaintiff met the requirements of the listing of an anxiety related impairment under 20 CFR Part 404, Subpt. A, App. 1 § 12.06. Id.

### 7. Trounstine

Peggy Trounstine, a social worker, noted in July 2015 that although Plaintiff was initially engaged in therapy, he canceled several sessions, and then stopped seeing her altogether. R. at 87–88, 543.

**B. The ALJ Decision**

On March 7, 2017, ALJ John G. Farrell issued a decision finding that Plaintiff had not been disabled since October 24, 2014. Id. at 22.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 17, 2014, the alleged disability onset date. Id. at 12. Second, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease (right hip, bilateral knees); status post lumbar disc surgery; status post bilateral hip replacement surgeries; degenerative disc

---

[1]  Episodes of decompensation are "temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 C. 4.

disease lumbar spine; lumbar spinal stenosis; spondylosis; and lumbar facet syndrome. Id. at

12–16. The ALJ noted Plaintiff's history of obesity and bariatric surgery, but did not include

obesity as a severe impairment. Id. at 14. Third, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),

404.125 and 404.1526). R. at 16. Fourth, the ALJ found that, during the relevant period, Plaintiff

had the RFC to perform the full range of sedentary work, and that Plaintiff could occasionally

perform all posturals, but that he should avoid concentrated exposure to hazardous machinery

and unprotected heights. Id. at 16–21. The ALJ considered Plaintiff's non-severe impairments in

assessing his RFC. Id. Finally, the ALJ found Plaintiff capable of performing past relevant work

as a "manager, merchandise." Id. at 21.

In finding no disability, the ALJ accorded little weight to Dr. O'Connor's opinion that

Plaintiff was disabled based on the extent of Plaintiff's physical limitations, finding that opinion

was not consistent with the opinions of Drs. Ortiz and Rogers, nor with Plaintiff's testimony as

to his daily activities. Id. at 20. The ALJ accorded significant weight to Dr. Rogers' opinion that

Plaintiff 's mean physical restrictions related to his low back, left hip, and left knee, and that

Plaintiff could not perform prolonged periods of standing or walking or moderate to heavy

lifting, because Dr. Rogers' opinion was consistent with Plaintiff's testimony about the extent of

his activities. Id. at 20. The ALJ accorded partial weight to Dr. Ortiz's opinion that Plaintiff had

no limitations of lifting, standing, or walking, since it was partially consistent with the record. Id.

at 20. The ALJ afforded little weight to Dr. Astruc's January 2017 assessment that Plaintiff met

the criteria of Listing § 12.06 for anxiety disorders, finding it was inconsistent with Plaintiff's testimony. Id. at 20.

Plaintiff appealed the ALJ's decision, but the SSA's Appeals Council denied review of the decision. Id. at 1–4.

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred in three ways: (1) failing to credit the opinion of certain treating physicians, and instead crediting the opinion of a medical consultant; (2) failing to consider Plaintiff's obesity as a severe impairment; and (3) failing to find that Plaintiff has a presumed disability pursuant to listings at 20 CFR Part 404, Subpt. A, App. 1 §§ 12.06 (for anxiety and obsessive-compulsive disorders) and 1.00B2(b) (for inability to ambulate); as to the latter listing, Plaintiff argues for inability to ambulate in part based on Plaintiff's obesity. Pl.'s Br. at 3–12.

### A.  ALJ's Treatment of Medical Opinions

First, Plaintiff claims that the ALJ's failure to credit the opinion of two treating physicians, Drs. Astruc and O'Connor, is not supported by substantial evidence, and that the ALJ erred in crediting the opinion of medical consultant Dr. Rogers, whom the ALJ erroneously characterized as a treating physician. Pl.'s Br. at 2, 6–7.

The SSA regulations provide that "opinions from [a claimant's] treating sources" are "give[n] more weight" than other sources, and are even given "controlling weight" when the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. § 404.1527(c)(2). This regulation ensures that the ALJ defers to the findings of the medical

sources "most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." Id.

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993). The Second Circuit Court of Appeals has noted that it "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order) (quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)). Factors that indicate the weight to be accorded to the treating physician include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ's decision provided "good reasons" for giving little weight to opinion of Dr. Astruc, but failed to provide "good reasons" for giving little weight to Dr. O'Connor's opinion. And the ALJ erred in the weight given to the opinion of Dr. Rogers.

### 1. Dr. Astruc

The ALJ detailed the "good reasons" and substantial evidence for giving little weight to Dr. Astruc's January 2017 conclusions. As to Dr. Astruc's January 2017 finding that Plaintiff had marked limitations in social functioning, the ALJ pointed to Plaintiff's own testimony that he gets along well with others, plays poker for two to three hours with family and friends, and occasionally goes fishing with his son. Id. at 15, 93–94, 96. The ALJ also noted Dr. Astruc's

earlier treatment records that showed Plaintiff presented appropriate grooming and hygiene and was cooperative with good eye contact. Id. at 14.

As to Dr. Astruc's January 2017 finding that Plaintiff had marked limitations in concentration, persistence, or pace, the ALJ again found substantial evidence in the record inconsistent with Dr. Astruc's finding. Id. at 14. In Dr. Astruc's June 12, 2015 assessment of Plaintiff, he noted that Plaintiff's insight, judgment, memory, and concentration were "intact," and that his thought process was "goal oriented." Id. at 56. This June 12, 2015 assessment is consistent with Dr. Astruc's assessment of Plaintiff at other appointments from 2015 through 2016. Id. at 29, 32, 35, 38, 41, 44, 47, 50, 53, 56, 59, 64, 547. The ALJ also noted that Plaintiff himself testified that he is able to drive, manage his money, bank online, watch movies (even though he had to stand up and stretch), play poker, and use computers—all indicative of an ability to concentrate. Id. at 15, 94, 96, 218–19. And aside from Astruc's January 2017 report, Astruc's (as well as Troustine's) treatment notes do not make any mention of repeated episodes of decompensation. Id. at 27–64, 526–47.

In further support for discounting Dr. Astruc's January 2017 conclusion regarding Plaintiff's mental impairments, the ALJ noted that Plaintiff had canceled and eventually ceased therapy treatments. Id. at 14. As the Second Circuit Court of Appeals has noted, a plaintiff's failure to seek regular treatment for his disabling conditions undermines his allegations of disability. Naval v. Astrue, 303 F. App'x 18, 20 (2d Cir. 2008).

### 2. Dr. O'Connor

However, the ALJ failed to provide good reasons for giving little weight to Dr. O'Connor's opinion that Plaintiff was disabled, was no longer capable of gainful employment,

12

and could sit for eight hours, stand for one hour, and walk for zero hours. Id. at 552. The ALJ

stated that he accorded little weight to Dr. O'Connor's opinion because it was inconsistent with

the opinions of Drs. Ortiz and Rogers, as well as Plaintiff's own testimony regarding his daily

activities. Id. at 20. It is true that contrary to Dr. O'Connor's opinion that Plaintiff could walk

zero hours, id. at 552, Plaintiff testified that he could walk and stand for approximately one hour

before needing to rest, and that he could maintain a cycle of walking, standing, and resting for ten

to fifteen minutes each, for six hours. Id. at 89, 100. However, the ALJ did not take account of

the fact that Plaintiff also testified that he could not keep up these cycles of walking, standing,

and resting for consecutive days. Id. at 100. And while Plaintiff testified to performing

housekeeping chores, walking his dogs, and fishing, id. at 94, 96, 228, 552, Plaintiff also testified

to the discomfort, pain, and toll on his body that accompanied activities like fishing and chores.

Id. at 91, 96, 99.

As for the ALJ's reliance on Dr. Ortiz in discounting Dr. O'Connor's assessment, Dr.

Ortiz did report that Plaintiff had no limitations in lifting/carrying, standing/walking, sitting,

pushing/pulling, or any other postural or manipulative limitation, id. at 448, but this checkbox

assessment by Dr. Ortiz is not supported by substantial evidence, and does not provide a basis for

not crediting Dr. O'Connor's opinion. Plaintiff's hip and knee replacements, his spinal stenosis,

his testimony as to his capacities, and assessments by the other doctors treating him all indicate at

least some physical limitations, contrary to Dr. Ortiz's finding of no limitations. And even Dr.

Rogers' opinion, on which the ALJ also relied in according Dr. O'Connor's opinion little weight,

stated that Plaintiff could not walk for prolonged periods. Id. at 506.

*3. Dr. Rogers*

The ALJ afforded "significant weight" to the opinion of Dr. Rogers. R. at 20, 504–07.

Plaintiff objects that such weight cannot be accorded to Rogers' opinion because he was only a

one-time, non-treating source, and not a "treating doctor" as the ALJ characterized him. Pl.'s Br.

at 7; R. at 19–20. A "treating" physician is a claimant's "own physician, psychologist, or other

acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation

and who has, or has had, an ongoing treatment relationship with [the claimant]." Brickhouse v.

Astrue, 331 F. App'x. 875, 877 (2d Cir. 2009) (citing C.F.R. § 404.1502).

The medical opinion of a treating physician is given "controlling weight if it is well

supported by medical findings and not inconsistent with other substantial record evidence." Shaw

v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). "[A] consulting physician's opinions," meanwhile,

"should be given limited weight" because "consultative exams are often brief, are generally

performed without the benefit or review of the claimant's medical history and, at best, only give

a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2nd Cir. 1990); see

also Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the

findings of consultative physicians after a single examination.").

Here, the ALJ erred in considering Dr. Rogers a treating physician, when, based on the

record, he appears to have been a consultative doctor who met with Plaintiff only once.

Accordingly, the ALJ must, on remand, accord weight to Dr. Rogers' opinion appropriate in light

of his standing as a consultative, not a treating, doctor. See Spielberg v. Barnhart, 367 F. Supp.

2d 276, 283–83 (E.D.N.Y. 2005) (finding that an ALJ gave too much weight to a single

assessment by a consultative physician).

14

The Court concludes that the ALJ erred by improperly discounting Dr. O'Connor's

opinion and, instead, affording "significant weight" to Dr. Rogers' opinion. Accordingly, the case

must be remanded to allow the agency to accord proper weight to the medical opinions in the

record, and with the proper weight assigned, make a new finding as to disability.

**B.      Listing § 12.06**

Plaintiff claims that his impairments meet the requirements of Listing § 12.06 (for anxiety

disorders). Pl.'s Br. at 2, 9.

The impairments contained in the Listing of Impairments "are impairments

acknowledged . . . to be of sufficient severity to preclude gainful employment. If a claimant's

condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be

disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995). Whether

a claimant's impairment meets or equals a listed impairment is decided at the third step of the

sequential evaluation. Id.

To qualify as an impairment under Listing § 12.06, the claimant's impairment must

satisfy the criteria in both paragraphs A and B, or the criteria in both paragraphs A and C, of that

listing. § 12.06.

To satisfy the paragraph B criteria for an anxiety disorder under § 12.06, Plaintiff must

show "extreme limitation of one, or marked limitation of two, of the following areas of mental

functioning: 1. Understand, remember or apply information; 2. Interact with others;

3. Concentrate, persist, or maintain pace; 4. Adapt or manage oneself." § 12.06(B).[2]  A "marked"

---

[2]  The SSA modified Listing § 12.06 in 2016, and the modifications went into effect in
January 2017. The implementing regulations state that the SSA "expect[s] that Federal courts
will review our final decisions using the rules that were in effect at the time we issued the

limitation means one that is "more than moderate, but less than extreme"—one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Gagnon v. Comm'r of Soc. Sec., 2016 WL 482068, at *4 (N.D.N.Y. Feb. 5, 2016) (quoting § 12.00(c)). As discussed above, Dr. Astruc's January 2017 report found Plaintiff had marked limitations in a number of these paragraph B areas of functioning. The Court has already found that Dr. Astruc's January 2017 conclusion is not supported by substantial evidence, and the Court for the same reasons finds a lack of substantial evidence of paragraph B criteria.

The paragraph C criteria require a claimant's anxiety, panic, or obsessive-compulsive disorder to be serious and persistent, meaning there is (1) medical documentation of the disorder for a period of at least two years and (2) evidence of both (a) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder" and "[m]arginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life." § 12.06(C).

In this case, the evidence likewise fails to establish the presence of the paragraph C criteria because it does not establish that Plaintiff has only "marginal adjustment." Plaintiff's testimony detailed his activities, including managing money, playing poker, using his computer, driving a car, shopping, cooking, fishing, walking the dogs, cleaning his clothes, and vacuuming. And pre-2017 reports from Dr. Astruc detailed Plaintiff's good concentration, intact memory,

---

decisions." Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, n.1 (Sept. 26, 2016). Because the ALJ's decision was issued on March 7, 2017, the January 2017 version of § 12.06 quoted here applies to Plaintiff's case.

normal thought content, and goal oriented thought processes. This record does not reflect that he

had a minimal capacity to adapt to changes in his life. See Mitchell v. Berryhill, No. 16-CV-

6588, 2018 WL 3300683, at *18 (S.D.N.Y. Feb. 2, 2018), report and recommendation adopted

sub nom. Mitchell v. Colvin, 2018 WL 1568972 (S.D.N.Y. Mar. 30, 2018), appeal dismissed sub

nom. Mitchell v. Comm'r of Soc. Sec. Admin., No. 18-1119, 2018 WL 5014178 (2d Cir. Aug. 8,

2018) (finding claimant did not have marginal adjustment where claimant had interactions with

family and friends at church, logical thoughts processes, intact judgment, good concentration,

and could cook, clean, shop, and do laundry).

As substantial evidence supports a finding that Plaintiff did not satisfy paragraphs B and

C criteria, the Court need not address paragraph A, which on its own cannot establish a § 12.06

impairment. Thus, substantial evidence supports a determination that Plaintiff did not satisfy

§ 12.06.

### C. Obesity

Plaintiff argues that the ALJ erred in not considering Plaintiff's obesity and not finding it

a severe impairment; in addition, he argues that given his obesity, he meets the requirements of

Listing § 1.00B2(b) (inability to ambulate effectively). Pl.'s Br. at 2, 9.

When considering whether a claimant's impairments meet or equal one or more of the

conditions listed in the regulations, an ALJ must consider the claimant's obesity and its effects in

combination with any musculoskeletal impairments.[3] <u>See</u> § 1.00(Q); see also S.S.R. 02–1p; <u>Orr</u>

<u>v. Barnhart</u>, 375 F. Supp.2d 193, 199 (W.D.N.Y. 2005). As the regulations observe,

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC], adjudicators must consider any additional and cumulative effects of obesity.

§ 1.00(Q). S.S.R. 02—1p, meanwhile, specifies that the Administration undertakes an

"individualized assessment of the impact of obesity on an individual's functioning when deciding

whether the impairment is severe." S.S.R. 02—1p.

Plaintiff's medical records include evidence of his obesity. Plaintiff is 5' 10" tall and

weighs around 280 pounds. R. at 203, 259. Plaintiff's body mass index is therefore 40.2, which

places Plaintiff is the highest category of obesity, Level III, sometimes referred to as "extreme"

or "severe" obesity. S.S.R. 02—1p.

It is of course true that the mere presence of a disease or impairment alone is insufficient

to establish disability; instead, it is the impact of the condition, and in particular any limitations it

may impose upon the ability to perform basic work functions, that is pivotal to the disability

---

[3]  Obesity was eliminated as a listed disability in October of 1999. <u>See</u> S.S.R. 00–3p. The agency, however, has made changes to the listings to ensure that the they still address obesity, and the description of obesity as a potential contributing factor to disability is now referenced in section 1.00(Q) of the Listings.

inquiry. See Rivera v. Harris, 623 F.2d 212, 215–16 (2d Cir. 1980). But aside from two sentences that mention that Plaintiff has a history of obesity and underwent bariatric weight-loss surgery prior to the relevant period, R. at 14, the ALJ decision does not meaningfully engage with Plaintiff's obesity, and its impact on his abilities. The ALJ decision's boilerplate language that he considered Plaintiff's non-severe impairments (listing post-bariatric status among some half-dozen other ailments) in assessing his RFC, id. at 13, 15, does not constitute an individualized assessment of the impact of obesity on Plaintiff's abilities.

The Court is unable to conclude that the ALJ sufficiently considered the impact of Plaintiff's obesity on his physical limitations. Accordingly, in view of the plain language of SSR 02–1p, the Court also remands for further consideration of Plaintiff's obesity, and an explanation thereof as required by S.S.R. 02–1p. See Cornell v. Astrue, 764 F. Supp. 2d 381, 400 (N.D.N.Y. 2010) (remanding for failure to sufficiently consider claimant's obesity).

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      May 22, 2019
            Albany, New York




Lawrence E. Kahn
U.S. District Judge